VERMONT SUPERIOR COURT
Chittenden Unit
175 Main Street, PO Box 187
Burlington VT  05402
802-863-3467
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 1097-12-19 Cncv



| Jazmin Tejada vs. Elvin Cordero |
|---|

# FINDINGS, CONCLUSIONS, AND ORDER

This is a partition action. At the time the action was commenced, the parties were joint owners of a condominium in South Burlington. Prior to trial, they sold the property; the sale proceeds remain in escrow. Thus, all that remained for trial was the division of the proceeds, taking into account the parties' respective contributions to the ownership, improvement, and maintenance of the property.

The parties tried the case to the court on February 10, 2021. In connection with their presentations, each party submitted spreadsheets showing their respective proposals for distribution of the proceeds. At the conclusion of the trial, the court invited updated submissions in this regard; the parties accepted the invitation but otherwise waived the right to submit proposed findings and conclusions. The court has received and reviewed the updated spreadsheets, and now makes the following findings by a preponderance of the credible evidence. On these findings, the court reaches the conclusions that follow, and orders the distribution of sale proceeds.

## FINDINGS

Plaintiff Jazmin Tejada and Defendant Elvin Cordero purchased the property at issue on June 5, 2017. At the time, they were a couple; Ms. Tejada moved to Vermont to live with Mr. Cordero and they agreed to purchase the property together. They lived there together until March 2019, when the relationship ended and Ms. Tejada moved out. Within a few months of moving out, Ms. Tejada asked Mr. Cordero to put the property on the market, but he refused. That refusal prompted Ms. Tejada to file this action. Even then, Mr. Cordero waited more than 9 months before agreeing to list the property; it went under contract within days of its being listed. The strong inference is that the parties could have sold the property more than a year earlier, on terms no less favorable than the eventual sale. During this entire time, at his sole election, Mr. Cordero continued to enjoy all the benefits of ownership, while Ms. Tejada enjoyed none.

When they purchased the property, the couple agreed to share expenses equally. They contributed equally to the down payment and were joint obligors on the mortgage and associated note.

Order
1097-12-19 Cncv Tejada vs. Cordero

Page **1** of **6**

Going forward, they paid equal shares of all expenses—mortgage payments (which included an escrow for taxes and mortgage insurance), homeowners' association fees, and utilities. There were two exceptions to this practice: first, early in their ownership, when the parties agreed to undertake some renovations and Ms. Tejada borrowed $5,000 from her father to pay for those improvements; and second, after Ms. Tejada moved out, when Mr. Cordero assumed sole responsibility, by default, for all expenses.

With respect to the first of these, in his testimony, Mr. Cordero testified first that the renovations were unnecessary and undertaken only at Ms. Tejada's insistence and then that he had paid for all the repairs while she reimbursed him only for her share. The court cannot credit this testimony; instead it credits Ms. Tejada's testimony that the parties agreed to undertake the renovations but could not afford to pay for them without her father's help. Accordingly, they agreed that Ms. Tejada would borrow the money from her father; she then paid the full cost from that loan. While neither party provided a precise accounting of the expenditures, the court credits Ms. Tejada's testimony that they came to the full amount of the $5,000 loan.

With respect to expenditures after Ms. Tejada moved out, there is less controversy. For the months of March and April 2019, Ms. Tejada paid a part of her 50% obligation, while Mr. Cordero covered her shortfall; in May 2019 she paid her share; and thereafter until the property was sold, Mr. Cordero paid all costs. He stopped making mortgage payments after April 2020. Also, from September 2019 through July 2020, he had help, to the tune of $900 per month, from a tenant. The complete record of these payments and contributions is shown on Defendant's Exhibit A, which the court appends to this decision and incorporates by reference. The bottom line is this: from the time Ms. Tejada moved out, the expenses paid for the condominium totaled $24,348. Of this amount, Mr. Cordero paid a total of $11,571.51, Ms. Tejada paid $1,977.01, and the tenant paid $10,800.

Along the way, Mr. Cordero replaced the kitchen window, at a cost of $1,156.70; Ms. Tejada agrees that this was a necessary repair. He also replaced the washer/dryer. While Ms. Tejada questions the necessity for the replacement, the court credits Mr. Cordero's testimony that the old unit was beyond repair, and that he acted reasonably in replacing it, at a cost of $1,578.46. The new unit was sold with the condominium, and presumably contributed to the value recognized in the sale price. Finally, in connection with the sale of the condominium, Mr. Cordero was required to clean the dryer vent, at a cost of $275; again, Ms. Tejada agrees that this was a necessary expense.

The property sold at the end of October 2020. The net proceeds of the sale were $27,777.65; that amount, as noted above, has been held in escrow by the law firm of Bauer Gravel Farnham LLP

pending resolution of this action. In addition, after the closing, the parties received two checks, which they have not yet negotiated, reimbursing them for excess expenses paid during their ownership of the property. These checks total $258.92, bringing the total to be divided in this action to $28,036.57.

**CONCLUSIONS**

Ms. Tejada commenced this proceeding as a statutory partition action. While she asked for an apportionment of joint personal property, neither party adduced any evidence from which the court could determine what personal property the parties owned, much less what each walked away with or the value of any such property. That portion of the case, therefore, is moot, leaving only partition of the real estate. During the course of the case, however, the parties agreed to sell the property, thereby mooting the remedies available under the statutes. *See* 12 V.S.A. §§ 5174 (assignment to party), 5175 (sale). Nevertheless, whether pursuant to statute or equitable powers, the court retains jurisdiction to apportion the proceeds of that sale. *See Wynkoop v. Stratthaus*, 2016 VT 5, ¶ 20, 201 Vt. 158 ("As the law has developed in this area, it is clear—although we have never stated it explicitly—that we are deciding the cases based on equitable principles and endorsing the use of flexible procedures derived from equity even though they may not fully comply with the statutes.").

In making this apportionment, the court must determine the weight to be given to the parties' respective contributions to the property after the initial purchase. As noted above, the parties agreed to share expenses, and followed that practice during the entire time that they were cohabiting, with the lone exception of Ms. Tejada's sole payment, early on, for jointly agreed renovations. After Ms. Tejada moved out, she stopped paying her equal share of expenses. Thus, the court examines the impact of three different sets of contributions: first, Ms. Tejada's $5,000 payment towards renovations; second, Mr. Cordero's payments to replace the washer/dryer and kitchen window and clean the dryer vent; and third, the parties' respective contributions to the payment of mortgage, insurance, homeowners association fees, and utilities after Ms. Tejada moved out.

In determining the weight to be given to these contributions, the court looks principally to the teachings of *Whippie v. O'Connor*, 2010 VT 32, 187 Vt. 523. There, the Court suggested the following procedure:

> Absent a compelling alternative approach, once cotenancy is established, the partitioning court should split the property in half and then consider equitable factors in the following order. First, the court may determine the contributions of each party towards the actual expenses of the house, including mortgage, insurance, taxes, utilities, repairs, and improvements. . . . . Second, the court should credit against contribution claims a rental value offset for any period of exclusion of a party ousted from the premises by the cotenants in possession. The court should next consider other equities cognizable in partition and then any allocation of costs and fees arising from partition.

*Id.* ¶ 15 (footnote omitted). The court also is mindful that in a partition action, " 'courts should consider all relevant circumstances to ensure that complete justice is done.' " *Wilk v. Wilk*, 173 Vt. 343, 346 (2002) (quoting 7 R. Powell, Powell on Real Property § 50.07[3][a], at 50–40 (M. Wolf ed. 2001)).

On the findings above, the treatment of the parties' payments for repairs and improvements to the property is straightforward. Here, "[t]he general rule is that cotenants who pay for discretionary improvements are entitled to a credit for the resultant increase in fair market value, not for the actual costs." *Wynkoop*, 2016 VT 5, ¶ 28. "We have recognized an exception, however, for contributions to improvements that were made under an agreement between cotenants or by the consent of the other cotenants, and we therefore have allowed credit for the cost of those improvements." *Id.* This exception covers the renovations for which Ms. Tejada paid; the parties agreed at the time to undertake them. At trial, she agreed that the kitchen window replacement and dryer vent cleaning were necessary; this agreement takes those items out of the category of discretionary improvements and places them in the realm of necessary repairs. With respect to the washer/dryer, when Mr. Cordero purchased it, in April 2019, he neither sought nor was denied Ms. Tejada's consent; rather, she had moved out, and was incommunicado. Moreover, as noted above, this was a necessary repair, not a "discretionary improvement." Thus, like the window replacement and dryer vent cleaning, purchase of the new washer/dryer unit is more appropriately viewed as repair or maintenance than improvement, and so beyond the reach of the "general rule."

The major point of controversy is how to treat the parties' respective contributions to the payment of periodic expenses after Ms. Tejada moved out. Here, the parties have submitted competing models, each of which the court rejects. Each of these approaches is more complicated than necessary, particularly in its analysis of the impact of Mr. Cordero's payment (or non-payment) of mortgage expenses, and each fails to account at all for the payments received from the tenant. Each also fails to account for the fact that after March 2019, Mr. Cordero alone enjoyed the benefits of ownership while also bearing the burden of paying all bills. Finally, each fails to account for the fact that it was Mr. Cordero's unilateral decision to delay putting the condominium on the market for over a year after Ms. Tejada had asked to do so.

The court instead applies Occam's razor, looking to the simple formula suggested in *Whippie*. The court notes at the outset that Ms. Tejada's departure from the property is not properly an ouster; there is no evidence to support that conclusion. *See Whippie*, 2010 VT 32, ¶ 19 ("The general 'presumption against ouster of a co-tenant can be overcome only by some overt and notorious act or

acts of an unequivocal character, indicating an assertion of ownership of the entire premises to the exclusion of the right of the co-tenant.' ") (citations omitted). Thus, there is no need to credit her with an offset for rental value.

Neither, however, is there need to subtract from her share of the equity her share of the expenses from March 2019 forward. While Mr. Cordero may not have ousted her, at least after some point early that summer, it was his sole choice not to sell the condominium and he alone benefited from that choice. Even so, Mr. Cordero did not end up covering Ms. Tejada's share of expenses. Rather, the tenant's rent payments more than covered that share. Consequently, while Mr. Cordero continued to benefit by his occupancy of the property, he did not have to pay more than his 50% share of expenses to do so. In fact, combining Ms. Tejada's contributions in March through April of 2019 with the tenant's payments, Mr. Cordero ended up paying slightly less than 50% of the expenses. That seems fair, however, considering that it was he alone who was responsible for all aspects of property management—finding a tenant, paying bills, and maintaining the property until the time of sale. *Cf. Wynkoop*, 2016 VT 5, ¶ 29 ("the trial court acted within its discretion in crediting plaintiff for sweat equity"). Thus, considering all the equities, the court treats the period after March 2019 as a wash in terms of adjustments to each of the parties' share in the condominium's equity. *See Wilk*, 173 Vt. at 346 (" 'courts should consider all relevant circumstances to ensure that complete justice is done.' ") (citation omitted); *see also Malletts Bay Homeowners' Ass'n, Inc. v. Mongeon Bay Properties, LLC*, 2008 VT 62, ¶13, 184 Vt. 541 (mem.) ("The court had discretion in weighing the competing interests.").

These conclusions lead to the following calculation, following the *Whippie* formula. The total equity in the property is $28,036.57, inclusive of the two checks yet to be negotiated. From this amount Ms. Tejada is entitled to be reimbursed for her $5,000 contribution towards renovations, and Mr. Cordero is entitled to be reimbursed $3,010.16 for his payments for washer/dryer, window replacement, and dryer vent cleaning. This leaves a net, to be divided equally, of $20,026.41— $10,013.21 to Ms. Tejada, and $10,013.20 to Mr. Cordero. As noted above, the equities do not call for an adjustment in either direction on account of the parties' respective contributions after March 2019. Thus, the total due each from the escrowed proceeds and uncashed checks is $15,013.21 to Ms. Tejada and $13,023.36 to Mr. Cordero.

## ORDER

The court orders first that both parties endorse the two outstanding checks to Bauer Gravel Farnham LLP's escrow account. From that account Bauer Gravel Farnham LLP shall then disburse one

check to Ms. Tejada in the amount of $15,013.21 and another to Mr. Cordero in the amount of $13,023.36. Ms. Tejada's counsel shall prepare the form of judgment required by V.R.C.P. 58. Each party shall bear her or his own costs.



Samuel Hoar, Jr.
Superior Court Judge

So Ordered